## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| LAURIE A. M., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )      1:24CV7 |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social | ) |
| Security, | ) |
| | ) |
| Defendant.[1] | ) |

## MEMORANDUM OPINION AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Laurie A. M., brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security (the "Commissioner"), denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 1.) The Commissioner has filed the certified administrative record (Docket Entry 7 (cited herein as "Tr. ___")), and both parties have submitted dispositive briefs in accordance with Rule 5 of the Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g) (Docket Entry 10 (Plaintiff's Brief); Docket Entry 12

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on November 30, 2024. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should substitute for Martin J. O'Malley as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

(Commissioner's Brief)).  For the reasons that follow, the Court will enter judgment for the Commissioner.[2]

## I.  PROCEDURAL HISTORY

Plaintiff applied for DIB (Tr. 192-96), alleging a disability onset date of January 10, 2020 (see Tr. 192).  Upon denial of that application initially (Tr. 72-78, 92-96) and on reconsideration (Tr. 79-86, 98-102), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 103).  Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing. (Tr. 33-71.)  The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act.  (Tr. 14-32.)  The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 189-91, 269-71), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings later adopted by the Commissioner:

1.    [Plaintiff] meets the insured status requirements of the . . . Act through December 31, 2025.

2.    [Plaintiff] has not engaged in substantial gainful activity since January 10, 2020, the alleged onset date.

3.    [Plaintiff] has the following severe impairments: asthma and obesity.

. . .

---

[2] On consent of the parties, "this case [wa]s referred to the [undersigned] United States Magistrate Judge . . . to conduct all proceedings . . ., to order the entry of judgment, and to conduct all post-judgment proceedings []herein." (Docket Entry 9 at 1.)

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [Plaintiff] has the residual functional capacity to perform light work (lift and carry 20 pounds occasionally and 10 pounds frequently[)], . . . except she should never climb ladders, ropes or scaffolds; she could occasionally climb ramps and stairs; she could frequently balance and kneel; she can occasionally stoop, crouch, and crawl; she should avoid concentrated exposure to extreme cold, heat, humidity and vibration; she can tolerate occasional exposure to pulmonary irritants such as dust, fumes, odors and gases; she can tolerate frequent but not constant exposure to workplace hazards such as unprotected heights and dangerous machinery.

. . .

6. [Plaintiff] is capable of performing past relevant work as an administrative clerk. This work does not require the performance of work-related activities precluded by [her] residual functional capacity.

. . .

In addition to past relevant work, there are other jobs that exist in significant numbers in the national economy that [Plaintiff] also can perform, considering [her] age, education, work experience, transferable skills, and residual functional capacity.

. . .

7. [Plaintiff] has not been under a disability, as defined in the . . . Act, from January 10, 2020, through the date of this decision.

(Tr. 19-27 (bold font and internal parenthetical citations omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits."  Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope of . . . review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).  Plaintiff has not established entitlement to relief under the extremely limited review standard.

### A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).  Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard."  Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)).  "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted).  "If there is evidence to justify a refusal to direct a verdict were the

4

case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id.

5

(quoting 42 U.S.C. § 423(d)(1)(A)).[3] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[4] A finding adverse to the claimant at any of several points in the SEP forecloses an award

---

[3] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantially identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

[4] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

6

and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." <u>Bennett v. Sullivan</u>, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." <u>Mastro</u>, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." <u>Id.</u> at 179.[5] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. <u>Id.</u> at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering

---

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." <u>Hines</u>, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." <u>Hall</u>, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." <u>Hines</u>, 453 F.3d at 562-63.

7

both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." <u>Hall</u>, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. <u>Hines</u>, 453 F.3d at 567.[6]

## B. Assignment of Error

In Plaintiff's first and only issue on review, she argues that "[t]he ALJ failed to account for the 'total limiting effects' of Plaintiff's severe impairments" in the RFC. (Docket Entry 10 at 2 (bold font and block formatting omitted).) More specifically, Plaintiff maintains that her subjective symptom reports established that "[s]he simply c[ould ]not perform the basic standing and walking requirements of either light or sedentary work due to her asthma" (<u>id.</u> at 6 (footnote omitted)), as well as that "the RFC failed to account for inevitable off-task and absenteeism limitations due her symptoms" (<u>id.</u>). According to Plaintiff, her "statements are patently consistent with the longitudinal record" (<u>id.</u> (bold font and block formatting omitted); <u>see also</u> <u>id.</u> at 6-8 (detailing evidence Plaintiff believes harmonizes with her

---

[6] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. <u>See, e.g.,</u> <u>Hunter</u>, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

subjective statements (citing Tr. 322-25, 330-31, 337, 356, 363, 375, 383-84, 427, 432, 686, 902, 917, 941-52, 1006-14, 1024))), and the ALJ failed to "construct[] an accurate and logical bridge between her inaccurate recitation of the facts and her conclusion that Plaintiff's self-described limitations were inconsistent with the record" (id. at 9 (internal quotation marks omitted)). For the reasons that follow, those arguments miss the mark.

RFC measures the most a claimant can do despite any physical and mental limitations. Hines, 453 F.3d at 562; 20 C.F.R. § 404.1545(a). An ALJ must determine a claimant's exertional and non-exertional capacity only after considering all of a claimant's impairments, as well as any related symptoms, including pain. See Hines, 453 F.3d at 562-63; 20 C.F.R. § 404.1545(b). The ALJ then must match the claimant's exertional abilities to an appropriate level of work (i.e., sedentary, light, medium, heavy, or very heavy). See 20 C.F.R. § 404.1567. Any non-exertional limitations may further restrict a claimant's ability to perform jobs within an exertional level. See 20 C.F.R. § 404.1569a(c).

"The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). . . . The [ALJ] must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."

9

Social Security Ruling 96-8p, <u>Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims</u>, 1996 WL 374184, at *7 (July 2, 1996) ("SSR 96-8p"). Although the ALJ need not discuss every piece of evidence in making an RFC determination, <u>see</u> <u>Reid v. Commissioner of Soc. Sec.</u>, 769 F.3d 861, 865 (4th Cir. 2014), he or she "must both identify evidence that supports his [or her] conclusion and build an accurate and logical bridge from that evidence to [that] conclusion," <u>Woods v. Berryhill</u>, 888 F.3d 686, 694 (4th Cir. 2018) (internal emphasis, quotation marks, and brackets omitted). Here, on several fronts, the ALJ's decision supplies the necessary "accurate and logical bridge," <u>id.</u> (internal quotation marks omitted), between her discussion of the evidence and the RFC assessment.

First, the ALJ's evaluation of the opinion evidence explains and supports the ALJ's determination that Plaintiff remained capable of up to six total hours each of standing and walking in an eight-hour workday (<u>see</u> Tr. 20), as involved in light-exertion work, <u>see</u> Social Security Ruling 83-10, <u>Titles II and XVI Determining Capability to Do Other Work – the Medical-Vocational Rules of Appendix 2</u>, 1983 WL 31251, at *6 (Jan. 1, 1983) ("SSR 83-10") (providing that "full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday"), as well as the ALJ's omission of allowances for off-task time and work absences in the RFC (<u>see</u> Tr. 20-21). In that regard, the ALJ found "not persuasive" the opinion of the

10

initial-level state agency medical consultant (Tr. 25), who limited Plaintiff to sedentary work with environmental limitations (see Tr. 75-76).  The ALJ expressly noted that "new evidence received at the reconsideration and hearing levels demonstrated that [Plaintiff]'s asthma ha[d] improved and maintained stability for a substantial period of time."  (Tr. 25.)  In accordance with that finding, the ALJ adopted the reconsideration-level state agency medical consultant's opinion that Plaintiff could perform light work involving up to six total hours each of standing and walking, with postural and environmental limitations, which did not contain any allowance for off-task time or work absences.  (See Tr. 25; see also Tr. 20-21 (ALJ's RFC mirroring reconsideration-level consultant's opinion); 82-83 (reconsideration-level consultant's RFC opinion).)  Moreover, the ALJ accorded only "some persuasive value" to the opinions of consultative medical examiner Angela Lamb, FNP-BC ("NP Lamb") (Tr. 26), who opined, inter alia, that Plaintiff's right-sided sciatica and shortness of breath would cause moderate limitations on her ability to walk (see Tr. 950).  In that regard, the ALJ noted that Plaintiff's "notes with treating physicians d[id] not reflect the same observations regarding . . . pain-based complaints related to sciatica or a musculoskeletal impairment," as well as that the ALJ "included obesity as a severe impairment to address [] some postural limitations identified by [NP] Lamb's examination, but greater

11

limitations were not warranted by the longitudinal treatment records." (Tr. 26.) Notably, NP Lamb did not include off-task time or work absences as a limitation. (See Tr. 941-51.)

Next, the ALJ's discussion of the medical evidence explains and supports the RFC. The ALJ made the following observations supporting her limitation to light exertion work and the lack of allowances for off-task time or work absences in the RFC:

- on January 27, 2020, Plaintiff's treating pulmonologist, Dr. Carl A. Smart, "observed that [Plaintiff's] pulmonary effort was normal, there was no accessory muscle usage or respiratory distress, her breath sounds were normal, and there were no decreased breath sounds, wheezing, rales or rhonchi" (Tr. 22 (emphasis added) (citing Tr. 425));

- "[o]n February 18, 2020, Dr. Smart stated that he felt [Plaintiff] had a fair amount of limitation in terms of her overall activity related to moderate persistent asthma without complication[; h]owever, his pulmonary exam was normal[, and o]n March 23, 2020, Dr. Smart noted [Plaintiff] continued to not feel well and ran out of air with any activity[,] . . . yet he did not observe any abnormalities upon [Plaintiff's] pulmonary exam, so his statement appears based on [Plaintiff's] subjective symptoms alone" (id. (emphasis added) (citing Tr. 363, 368, 375, 380) (internal parenthetical citations omitted));

- on June 1, 2020, "Dr. Smart noted that[,] from an asthma standpoint, [Plaintiff's] lungs were actually clear" and "modified [Plaintiff's] assessment from asthma to 'shortness of breath'" (Tr. 22-23 (emphasis added) (citing Tr. 349, and quoting Tr. 759));

- "Dr. [Jeffrey C.] Hutchins in primary care noted on June 3, 2020 that [Plaintiff] received reassurance from [Dr. Smart] that [Plaintiff's] asthma was under acceptable control[, Plaintiff]

12

reported she did <u>not</u> have any wheezing accompanied by her shortness of breath[, h]er in-office oximetry's [sic] were also felt to be <u>acceptable</u>, and there was some concern that it was anxiety-induced shortness of breath," and "Dr. Hutchings also observed that [Plaintiff] had <u>normal</u> breath sounds, and <u>no</u> stridor, wheezing, rhonchi or rales" (Tr. 23 (emphasis added) (citing Tr. 343, 345));

• "[Plaintiff] underwent a spirometry in July 2020, which revealed only <u>mild</u> obstructive lung disease and essentially <u>normal</u> diffusion," and, "[w]hile . . . there was a worsening compared to the prior normal study, obstructive lung disease of a <u>mild</u> nature does not align with [Plaintiff]'s allegations that she has been totally disabled due to her asthma" (<u>id.</u> (emphasis added) (citing Tr. 328, 825, 839));

• in January 2021, Plaintiff "had evidence of asthma exacerbation . . . [and] had wheezing on exam, but her SpO2 was 95% on room air and there were no decreased breath sounds" and, while "her complaints increased at the March 2021 visit[,] . . . [and] Dr. Smart s[t]ated [Plaintiff's] asthma was still an ongoing issue and added Spiriva . . ., [] his exam was <u>normal</u>" (Tr. 24 (emphasis added) (citing Tr. 917, 923, 925, 931));

• in May 2021, consultative examiner NP Lamb noted that Plaintiff "had extreme difficulty getting a deep breath, and speaking or any movement made it much worse," but Plaintiff's "lungs were <u>clear</u> to auscultation and percussion bilaterally" and "[s]he had <u>no</u> wheezes, rales or rhonchi" (<u>id.</u> (emphasis added) (citing Tr. 941-51));

• in July 2021, Plaintiff "reported . . . that she used her nebulizer/inhaler on average <u>0</u> times per week and her exam was again <u>normal</u>" and, "[i]n November 2021, she said she had experienced an increase in shortness of breath and coughing," and Dr. Smart "documented wheezing and rhonchi, but [Plaintiff's] blood oxygen level was <u>98%</u> on room air" and, "evidently[,] her symptoms were not so severe as to warrant a follow-up, as the next one was not scheduled for another <u>four months</u>" (<u>id.</u>

13

(emphasis added) (internal parenthetical citation omitted) (citing Tr. 969, 977, 1017, 1024, 1026));

- in February 2022, Plaintiff "reported she was not doing well, but at the same time, she had <u>not</u> reached out in the interim to report she was not doing well or gone into the [emergency room] or to [u]rgent [c]are for resolution of an exacerbation," and "it was noted that she was <u>feeling good</u> until the weather changed" (Tr. 24-25 (emphasis added) (citing Tr. 1006, 1014));

- "[w]hen most recently seen in late June 2022, [Plaintiff] admitted she was feeling <u>a lot better</u> and doing <u>quite well</u>," and that "she was starting to do a little more gardening," and Dr. Smart stated that [Plaintiff's] lungs were <u>pretty clear</u>" (Tr. 25 (emphasis added) (citing Tr. 996)).

These observations support the ALJ's overall findings that Plaintiff "had a history of asthma that had been adequately controlled, but at the time of the alleged onset date, the physical environment at her place of employment changed such that her symptoms of asthma were exacerbated due to underlying inflammation," that "Dr. Smart made objective documentation[] of this exacerbation during his exam in January [2020], but at follow-ups over the ensuing months, all his pulmonary examinations were within normal limits," and that Plaintiff's "asthma was under adequate control by the summer of 2020 after an exacerbation due to a specific situation with dust in the environment in her prior place of employment in the earlier part of [2020]." (Tr. 23.)

Plaintiff faults the ALJ's discussion of the medical evidence on three grounds: 1) the ALJ incorrectly found that Plaintiff's "respiratory exams were only 'occasionally abnormal'" and showed

14

rhonchi only "'*once*'" (Docket Entry 10 at 9 (quoting Tr. 25) (emphasis supplied by Plaintiff)); 2) the ALJ "failed to note that Plaintiff's mediastinal lymphadenopathy was 'extensive'" (id. (citing Tr. 20, and quoting Tr. 324)), and 3) the ALJ "erroneously concluded that [Plaintiff's] asthma 'did not require unplanned visits to . . . the [emergency room] or [u]rgent [c]are'" (id. (quoting Tr. 25)). In Plaintiff's view, "[t]he ALJ could not have constructed an accurate and logical bridge between her inaccurate recitation of the facts and her conclusion that Plaintiff's self-described limitations were inconsistent with the record." (Id. (internal quotation marks omitted).) As explained below, none of those grounds renders the ALJ's analysis of the medical evidence unsupported by substantial evidence.

Although the ALJ erred by stating that Plaintiff's examinations had revealed rhonchi on only <u>one</u> occasion (<u>see</u> Tr. 25), instead of the <u>four</u> occasions reflected in the record (<u>see</u> Tr. 432 (Jan. 9, 2020), 448 (October 15, 2019 (pre-onset date)), 1014 (Feb. 28, 2022), 1024 (Nov. 29, 2021)), that error remains harmless under the facts of this case, <u>see generally</u> <u>Fisher v. Bowen</u>, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that, "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). As an initial matter, the ALJ's discussion of Plaintiff's treatment records

15

expressly recognized <u>two</u> occasions on which Dr. Smart detected rhonchi in Plaintiff's lungs (<u>see</u> Tr. 22 (citing Tr. 432), 24 (citing Tr. 1024)) and, thus, the ALJ actually acknowledged two of the three instances of detected rhonchi during the relevant period in this case, i.e., post-dating the alleged onset date. Moreover, Dr. Smart (or nurse practitioners working under his supervision) detected rhonchi in Plaintiff's lungs on only <u>four</u> occasions out of the <u>26</u> examinations in the record covering a <u>three and a half year period</u> from January 2019 to June 2022. (<u>See</u> Tr. 432, 448, 1014, 1024 (rhonchi detected); <u>see also</u> Tr. 328, 336, 354, 361, 368, 380, 425, 439 446, 456, 464, 467, 478, 487, 492, 496, 499, 503, 693, 923, 977, 1004 (rhonchi not detected).) Given those isolated and sporadic occurrences of rhonchi, Plaintiff simply has not shown that remanding for the ALJ to expressly discuss the two rhonchi findings omitted from the ALJ's decision would lead to a different outcome in Plaintiff's case.[7]

Plaintiff's complaint that the ALJ "failed to note that Plaintiff's mediastinal lymphadenopathy was 'extensive'" fares no better. (Docket Entry 10 at 9 (citing Tr. 20, and quoting Tr. 324).) The ALJ observed as follows with regard to findings of mediastinal lymphadenopathy on CT scans of Plaintiff's chest:

---

[7] Notably, all seven examinations by primary care physician Dr. Hutchings (<u>see</u> Tr. 340, 345, 372, 471, 481, 979, 991), all three examinations by urologist Theodore S. Stamatakos (<u>see</u> Tr. 292, 297, 303), and the consultative examination by NP Lamb (<u>see</u> Tr. 945) showed negative findings on examination pertaining to Plaintiff's lungs.

Although a CT scan of [Plaintiff's] chest in October 2019 showed scattered sub-centimeter pulmonary nodules and thoracic lymphadenopathy, 'favored related to underlying <u>sarcoidosis</u>,' and mosaic attenuation suggesting small airway disease ([Tr. 326]), a CT pulmonary angiogram in October 2019 compared to that taken in May did show only a mildly increased mediastinal and hilar lymphadenopathy, there were "no pulmonary findings of <u>sarcoidosis</u>," and minimal scarring/atelectasis ([Tr. 351]). She has not been diagnosed with <u>sarcoidosis</u> by a treating physician. Accordingly, the [ALJ] finds that <u>sarcoidosis</u> has not been established as a medically determinable impairment given that there has been contradictory imaging and the radiologist's interpretation was not translated into a diagnosis by [Plaintiff's] pulmonologist.

(Tr. 20 (emphasis added).) As this discussion makes clear, the ALJ referenced the findings of mediastinal and hilar lymphadenopathy in the context of finding Plaintiff's <u>sarcoidosis</u> a non-medically determinable impairment at step two of the SEP. (See <u>id.</u>) Plaintiff has not challenged that determination by the ALJ (see Docket Entry 10) and, thus, has not shown how the ALJ's omission of the word "extensive" to describe Plaintiff's lymphadenopathy impacted her claim in any way.

Plaintiff additionally argues that the ALJ "erroneously concluded that [Plaintiff's] asthma 'did not require unplanned visits to . . . the [emergency room] or [u]rgent [c]are'" (<u>id.</u> at 9 (quoting Tr. 25)), and notes that "[c]onsultative examiner NP Lamb instructed [Plaintiff] to go to the emergency department based on her vital signs and extreme shortness of breath" (<u>id.</u> (citing Tr. 950)). The record, however, does not reflect that Plaintiff actually visited an emergency room or urgent care facility for her

17

shortness of breath symptoms following NP Lamb's examination or at any other time covered by the record in this case. Indeed, the only emergency room visit in the record pertains to flank pain caused by a kidney stone in February 2020. (See Tr. 308.) Plaintiff has thus not shown that the ALJ erred by observing that Plaintiff's asthma "did not require unplanned visits to . . . the [emergency room] or [u]rgent [c]are" (Tr. 25).

Lastly, the ALJ's analysis of Plaintiff's subjective symptom reporting further explains and supports the RFC's limitations. The ALJ discussed Plaintiff's testimony "that just walking a short distance, she has to stop and catch her breath because of how shallow her breathing gets," that "she has to walk so slow that she is slower than elderly people walking with a cane," that "she cannot do stairs or inclines, and [that] she never knows when she is going to have a flare" (Tr. 21 (referencing Tr. 47-48)), but found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e ALJ's] decision" (id.). In further support of that finding, the ALJ commented on the type and effectiveness of Plaintiff's treatment, noting that "the medical records show that throughout the relevant period, [Plaintiff] has continued to do well on her medications other than some temporary exacerbations in her asthma that did not require

18

unplanned visits to pulmonology to address, much less the [emergency room] or [u]rgent [c]are," and that "[h]er exacerbations have resolved with prednisone and continuing her prescriptions." (Tr. 25.)

Plaintiff characterizes the ALJ's statement that Plaintiff's asthma "'exacerbations have resolved with prednisone and continuing her prescriptions'" as "simply not reflective of the record." (Docket Entry 10 at 10 (quoting Tr. 25).) In that regard, Plaintiff points to her testimony that "[h]er chronic asthma is easily triggered by minimal activities, such as walking from an accessible parking space to the front of a store" (id. (citing Tr. 48)), and that "[e]ven speaking can trigger severe coughing fits and shortness of breath" (id. (citing Tr. 49)). Plaintiff further notes that "the ALJ's own recitation of the facts" (id.) acknowledged that "'Dr. Smart noted [Plaintiff] continued to not feel well and ran out of air with any activity'" (id. at 10-11 (quoting Tr. 22)), as well as that, "during the consultative examination, '[Plaintiff] had extreme difficulty getting a deep breath, and speaking or any movement made it much worse'" (id. at 11 (quoting Tr. 24)). According to Plaintiff, "the [United States Court of Appeals for the] Fourth Circuit recognizes that th[e waxing and waning nature of an impairment] does not necessarily undermine one's claim." (Id. at 10 (quoting Shelley C. v. Commissioner of Soc. Sec. Admin., 61 F.4th 341, 368 (4th Cir. 2023)

19

for observation that "'[t]he waxing and waning of [the plaintiff's] symptoms would hinder her from being a dependable employee'").)

Plaintiff's reliance on her own testimony and subjective statements to her providers to challenge the ALJ's finding that Plaintiff's asthma "'exacerbations have resolved with prednisone and continuing her prescriptions'" (id. (quoting Tr. 25)) falls short. As discussed above, the ALJ did not fully credit Plaintiff's subjective symptoms reports (see Tr. 21), and Dr. Smart's mere documentation of Plaintiff's subjective complaints of shortness of breath did not "transform[ Dr. Smart's] observations into clinical evidence," as that "would completely vitiate any notion of objective clinical medical evidence," Craig, 76 F.3d at 590 n.2 (internal quotation marks omitted); see also id. ("There is nothing objective about a doctor saying, without more, I observed my patient telling me she was in pain." (internal quotation marks omitted)).[8] Although the ALJ did acknowledge NP Lamb's observation that Plaintiff "had extreme difficulty getting a deep breath, and speaking or any movement made it much worse" (Tr. 24 (referencing Tr. 945)), the ALJ also noted that NP Lamb found Plaintiff's "lungs clear to auscultation and percussion bilaterally," and that "[s]he had no wheezes, rales or rhonchi" (id. (referencing Tr. 945)).

---

[8] Indeed, the ALJ recognized the inconsistency between Dr. Smart noting that Plaintiff reported "not feel[ing] well" and "r[unning] out of air with any activity" (Tr. 22 (citing Tr. 375)), and Dr. Smart's normal pulmonary exam, concluding that Dr. Smart's "statement appear[ed] based on [Plaintiff's] subjective symptoms alone" (id. (citing Tr. 380)).

20

Moreover, the ALJ ultimately accorded NP Lamb's opinions only "some persuasive value," observing (accurately) that Plaintiff's "notes with treating physicians d[id] not reflect the same observations regarding her difficulty speaking and communicating" (Tr. 26).

With regard to Plaintiff's reliance on <u>Shelley C.</u>, as another district court within the Fourth Circuit recently recognized in distinguishing that case because the ALJ there (like the ALJ here and unlike the ALJ in <u>Shelley C.</u>) had not ignored evidence of exacerbations and had properly concluded that the plaintiff's symptoms improved with treatment:

> This case is [ ] distinguishable from *Shelley C.*, where the ALJ improperly ignored the waxing and waning nature of depression by citing only to treatment notes where the claimant was stable and by omitting evidence of the claimant's subsequent periods of intense depression symptoms. Here, the ALJ noted that treatment notes indicate [the p]laintiff's condition improved over time. [The p]laintiff argues that because she endorsed symptoms of depression during treatment and because she sometimes needed adjustments to her medications, the ALJ erred in finding her not credible. But the ALJ is permitted to find that [the plaintiff]'s symptoms do not render her totally disabled despite the fact that her symptoms exist and are limiting to a certain extent.

<u>Lasharne W. v. Commissioner, Soc. Sec. Admin.</u>, No. CV 21-2603, 2023 WL 2414497, at *4 (D. Md. Mar. 8, 2023) (unpublished) (internal quotation marks and citations omitted).

In sum, Plaintiff's first and only assignment of error fails as a matter of law.

21

## III. CONCLUSION

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE ORDERED** that the Commissioner's decision finding no disability is **AFFIRMED,** and that this action is **DISMISSED** with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

December 31, 2024